# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | | |
|---|---|---|
| KAREN L. MATUS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 CV 50017 |
| | ) | Magistrate Judge Iain D. Johnston |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Karen L. Matus brings this action under 42 U.S.C. § 405(g), seeking reversal of the decision denying her social security benefits. As explained below, the case is remanded.

## BACKGROUND

Although plaintiff has certain physical ailments, such as back pain and fibromyalgia and also suffers from obesity, this appeal only concerns her psychiatric ailments—specifically, depression and anxiety. The following summary therefore focuses on those issues and does not summarize all the medical evidence.

On January 29, 2010, plaintiff filed a Title II application for disability insurance benefits, alleging an onset date of October 30, 2006. A hearing before an administrative law judge ("ALJ") was held on June 1, 2012. At the start of the hearing, plaintiff's attorney argued that plaintiff qualified under Listing 12.04 (depression) and cited to plaintiff's personnel file from the Wisconsin School for the Deaf where she taught for 12 years. According to counsel, the 54-page personnel file "reflects [plaintiff's] debilitating depression with frequent absences and tardies and then medical leaves due to her depression" and shows that "she remains unable to work a full-time schedule." R. 50. The medical expert at the hearing, Dr. Michael Carney, was then

asked whether he had been able to look at these records. He stated that he "looked at them just a little bit" but "didn't really study them [] too much." *Id.* Shortly after this admission, the ALJ stated the following to Dr. Carney: "Okay. Very well then. If you need extra time prior to your testimony to review those just let me know. We'll go off the record and let you do that." R. 50. Unfortunately, the record contains no indication whatsoever that this additional time was provided or that Dr. Carney subsequently reviewed these records before providing his testimony.

Plaintiff testified that she was 44 years old, five feet four inches tall and weighed 260 pounds, and married with two children. She graduated from college with a degree in Deaf Studies Teacher Education. R. 51-52. In 1995, she began working as a teacher at the Wisconsin School for the Deaf. She stopped working in October 2006 (the reasons why are examined below) and was given a medical termination effective April 2007. R. 53, 234. Under a long-term disability insurance policy, at the time of the hearing, she was receiving $2,099 per month. R. 54.

Since she quit working, plaintiff has spent most of her time taking care of her two children. At the time of the hearing, her daughter was ten and had just finished the fourth grade. She is high functioning on the autistic spectrum, has pervasive developmental disorder, and "a lot of struggles with social, emotional issues." R. 56. Plaintiff will spend time "talking through things with her, helping her to understand things, and trying to maintain [] a calm demeanor because sometimes she can go real quickly from fine to being upset." R. 56. Plaintiff arranged social interaction for her daughter through Girl Scouts and 4-H and also let her play with friends in the neighborhood. A therapist also came to the home five to six days a week. R. 57. Most of the time, plaintiff did not participate in the therapy sessions.

At the time of the hearing, plaintiff's son was eight years old and had just finished the second grade. He has "classic autism, as well as dwarfism, and bilateral hand deformities" (only

one finger on the left hand and three on the right). R. 57, 60. He was not potty-trained and wore pull-ups. Plaintiff described him as being "like a perpetual 2-year-old" and "more intense than his sister." R. 59. Like his sister, he also had a therapist that came to the home. Just as plaintiff did not attend her daughter's therapy sessions, plaintiff generally did not attend her son's therapy sessions. Plaintiff testified that the therapist usually came "from 2:30 to 4:30 or 2:30 to 5:30 depending on how many hours that day [that] they'll work with [her] son and then two hours after that they'll work with [her] daughter." R. 64. (It thus appears that there was one therapist who worked with both children.) The therapist also worked with her son at school to help with consistency.

Plaintiff testified that the children are in school until about 2:30 when they get off the bus. While they are school, plaintiff "will go back to bed and sleep, sometimes for a few hours, sometimes [] all the way until 2:00 p.m." R. 63. She set her alarm for 2:00 p.m. so she could get up and meet them at the bus drop-off at 2:30 p.m. She estimated that three out of five days a week she slept until 2:00 p.m. and had to be awakened by the alarm clock. Plaintiff spent this time in bed because of "depression or just general fatigue, low energy." R. 63. On these days, she typically would not shower, answer the phone, or open mail. Plaintiff's parents lived close by and helped, which plaintiff estimated was "sometimes every two weeks or sometimes it's several times a week." R. 63. Her husband came home at 7:00 pm. Sometimes, in the mornings, plaintiff would be late and her children would miss the bus. Occasionally, when this happened, plaintiff would call and tell the school that they were sick because she was too tired to drive them. R. 70.

Before the therapist came over in the afternoons, plaintiff would try to clear a walking path through the clutter covering the floor. When asked whether the therapists asked her to sign a document about the clutter, plaintiff stated:

> Yes, they did. They asked me to sign a paper. They were concerned about [the] safety of the kids regarding food that sometimes gets left on the floor or something that I don't always see right away and then, you know, my son will come back later and try to eat it after it's been sitting out for a long time.

R. 65. Plaintiff described how her house looked:

> The dishes are always piled up. There's always a lot of clutter, things on the floor kind of off to the sides of the walls. [W]ith the vacuuming a lot of times that doesn't get done very often so [] crumbs or dirt will accumulate to a point where it's [] kind of messy.

R. 65. Three to four nights a week, plaintiff would cook a simple dinner for the family. R. 68. But a lot of times her husband would pick up something on the way home from work.

Plaintiff's primary doctor was Dr. McCoy, and plaintiff also saw both a psychologist and a psychiatrist. R. 71. Her psychiatrist was Dr. Callison who prescribed Cymbalta, Lexapro, and BuSpar, among other medication. Plaintiff stated that these drugs helped keep her from being suicidal.

After plaintiff testified, Dr. Michael Carney, a psychologist, testified. He stated that plaintiff had been diagnosed with bipolar disorder several times, but he did not "really see any basis in the records for that particular diagnosis." R. 78. He then noted that plaintiff had been diagnosed with major depressive disorder, generalized anxiety disorder, and personality disorder. In considering Listing 12.04 (depression), he noted that "very extensive records" did support that plaintiff had excessive sleeping, low energy, and concentration problems. However, he found that plaintiff had only mild limitations in activities of daily living because she was able to take care of her children and vacuum and clean and cook on occasion. R. 79.

A vocational expert, Margaret H. Ford, testified that plaintiff could not perform her past work as a teacher if she were limited to simple, routine tasks, but that she could work other jobs

such as cleaner and washer.[1] The expert noted that plaintiff would not be able to work any job if she missed at least three days a month or if she were tardy 16 out of 33 work days. R. 84-86. (Plaintiff's personnel records showed she missed this amount of time from work.)

On June 25, 2012, the ALJ issued her opinion. She found that plaintiff had severe impairments that included depression and anxiety, but that plaintiff did not meet any mental health listings, and that plaintiff had the residual functional capacity ("RFC") to perform light work limited to simple, routine tasks. The ALJ placed much weight on the conclusion that plaintiff was not able to work "because caring for her children is a full time job." R. 37. In other words, the ALJ indicated that plaintiff was capable of working but was too busy caring for her children. The ALJ further noted that it was reasonable that plaintiff felt "overwhelmed by her life" given the "substantial needs of her children," along with her mental and physical impairments.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593

---

[1] Opining that a person like plaintiff could be employed as a cleaner or washer is reminiscent of the cobbler's children proverb.

(7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, *33-34 (N.D. Ill. 2013).

Plaintiff raises two main arguments. First, she asserts that the ALJ failed to consider various lines of evidence in the RFC formulation. Second, she asserts that the ALJ improperly discounted her credibility. This Court agrees that these arguments together justify a remand.

**I.   Failure To Consider All The Evidence In the RFC Analysis.**

Plaintiff first argues that the ALJ failed to analyze evidence from her personnel file at the Wisconsin School of the Deaf. This evidence, according to plaintiff, shows that she had ongoing problems with depression going back to at least 2000 and that she had been punished during one 33-day stretch in 2005 for being tardy 16 times and that she had sought medical leaves on various occasions. *See* Ex. 12E; R. 213, 217, 231,

Plaintiff is correct that the ALJ never acknowledged this evidence, particularly the chronic problem with tardies and absences. It was raised at the hearing, and plaintiff's counsel specifically asked the medical expert about the personnel records. The expert's response—that he looked at them "just a little bit" but didn't really "study" them "too much"—raises doubt

about whether he actually reviewed them in a serious way.[2] The vocational expert testified that a person who was tardy 16 out of 33 work days would be precluded from work. In its response brief, the government argues that the ALJ addressed this particular evidence, but did so indirectly. According to the government, the ALJ considered this evidence when she acknowledged that plaintiff was receiving long-term disability benefits from her prior employer and was terminated because she could not keep pace and when she stated that plaintiff occasionally misses doctor appointments. Dkt. # 16 at 8. However, this argument attempts to prove far too much. These vague statements are not responsive to the specific issue about tardies and absences. There is no way a reasonable reviewing court would know whether the ALJ considered this evidence and, if she did, how she analyzed it. *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014) ("By failing to even acknowledge that evidence, the ALJ deprived us of any means to assess the validity of the reasoning process.").

Plaintiff next argues that the ALJ failed to acknowledge that Dr. Jennifer Stoll, who performed neuropsychological testing of plaintiff over several days in 2012, found that plaintiff was reporting depression and anxiety at a severe level. It is true that, unlike the personnel record, the ALJ did not completely ignore the results of Dr. Stoll's testing. In two paragraphs, the ALJ summarized various aspects of the testing, noting that plaintiff performed quite well with memory testing and other parts of the test. R. 35-36. This evidence was certainly relevant and deserved to be considered and, as the ALJ noted, suggested that plaintiff's cognitive or intellectual abilities were not significantly impaired. This may be true, but misses the import of the evidence as it relates to plaintiff's claim of disability. As this Court understands plaintiff's case, she is basing her claim for disability more on the emotional problems allegedly caused by

---

[2] Again, although the record contains a statement that the medical expert would be allowed to review these documents, there is absolutely no indication that he did so after being given this opportunity.

her depression and anxiety. Plaintiff complains that the ALJ ignored, or at least glossed over, the portions of Dr. Stoll's findings relating to her emotional problems. Specifically, among the tests administered were the Beck Anxiety Inventory and the Beck Depression Inventory. R. 947. Dr. Stoll noted that "[f]rom a psychological perspective, [plaintiff] is presently endorsing a severe degree of anxiety as well as depression." R. 948. Nothing in the record shows whether the ALJ considered this evidence, which, unlike the evidence relating to plaintiff's cognitive and intellectual abilities, pointed to a more serious problem. The ALJ noted at one point that plaintiff was "endorsing a severe level of anxiety and depression." R. 36. Although this language seems to mirror Dr. Stoll's report, the way it is described by the ALJ makes it sound as if this were merely plaintiff's self-report and one not supported by Dr. Stoll or backed up by any objective testing. Therefore, it is not clear whether the ALJ gave this finding by Dr. Stoll the same weight given to the other findings by Dr. Stoll. Plaintiff has placed a lot of weight on this argument, believing that Dr. Stoll's observation is strong support for her claim. This is an issue the ALJ should clarify on remand and then provide more explicit analysis. By itself, this failure likely would not warrant a remand, but when considered with all the other arguments herein, the failure counsels in favor of remand.

Plaintiff's third and strongest RFC-related argument is that the ALJ gave short shrift to evidence about her daily activities. This Court agrees that further analysis and explanation is needed, as the ALJ's discussion fails to address the whole record, thus giving the impression of being result-oriented and one-sided. In the analysis portions of the opinion, which include both the finding at step two and the RFC analysis, the ALJ stated without qualifications that plaintiff was able to perform the "full range" of daily activities and childcare duties for two special needs children. *See* R. 30; *see also* R. 36 ("the claimant was able to engage in a *broad range* of daily

activities involving caring for her children") (emphasis added). These statements suggest plaintiff had virtually no limitations. However, the ALJ ignored several important contextual factors. *Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (an ALJ may not ignore a line of evidence contrary to his conclusion).

One factor is that plaintiff was able to care for her children only with help from several other people. This included not only her husband and parents, but also therapists who came to the house several hours during the day approximately five to six days a week. Her children were in school or on the bus from about 8:00 am until 2:30 pm. When they came home, they were both seen by a therapist for several hours. Plaintiff was rarely involved in these sessions. Then her husband came home and helped, and her parents also periodically came over, sometimes twice a week. During non-school days, her daughter would go play with other friends in the neighborhood. In short, although plaintiff's children required much care, plaintiff was not the only one providing it. Indeed, the record establishes she played a limited role, contrary to the ALJ's findings. R. 36.

The ALJ essentially ignored these facts. As noted above, the ALJ did not mention them in the analytical portions of the opinion. In the factual narrative portions of the opinion, the ALJ referred only in passing to the fact that plaintiff had help. The ALJ, for example, stated briefly that plaintiff's daughter "has a therapist who visits the home." R. 32. Critically, however, the ALJ omitted the fact that the therapist came five or six times a week for several hours. These facts debunk the ALJ's findings. The ALJ also did not mention at all that a therapist (who may be the same person) also saw her son on the same basis. The Seventh Circuit has stated that ALJs should take into consideration that a claimant has additional help in daily activities such as caring for children. *See, e.g., Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (faulting the ALJ

for failing to consider that the claimant's ability to live independently was aided by her adult daughter who helped out); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (claimant received help in her daily activities from her husband and other family members); *see also Croarkin v. Colvin*, 2014 WL 274054, *9-10 (N.D. Ill. Jan. 24, 2014) (the ALJ's "abbreviated discussion" of plaintiff's ability to care for three young children, including one with cerebral palsy, "overlooked" the fact that a therapist visited the home four days a week).

Related to the above point is plaintiff's testimony that she slept much of the time while her children were in school. The ALJ significantly downplayed this fact by stating: "She remains capable of performing daily activities, and to the extent she reports limitations, she generally claims that she is overwhelmed due to life stressors, and so chooses to nap during her limited free time." R. 34-35. This description makes it sound as if plaintiff's napping were limited in scope and merely a lifestyle choice not dictated by her psychiatric conditions. This is not an accurate summary of her testimony. As for the "limited" nature of the napping, plaintiff testified that some days she went to bed after the kids went to school in the morning and then slept until 2:00 p.m. This is roughly six additional hours of sleeping. It is unreasonable to characterize a six hour "nap" as "limited." Plaintiff testified that she needed to sleep to get through the other parts of her day. This fact should have been considered in assessing whether plaintiff could work a full 8-hour shift five days a week. *See Hamilton v. Colvin*, 525 Fed. Appx. 433, 438 (7th Cir. 2013) ("We have [] recognized that a person who needs to spend much of the day lying down cannot work."); *Croarkin*, 2014 WL 274054, at *10 (the ALJ "did not take note of [Plaintiff's] alleged need for sleep" after the "toll that Plaintiff stated her [daily]activities had on her").

In general, the Seventh Circuit has stated that ALJs should be careful about placing too much weight on a claimant's ability to care for her children. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (the ALJ failed to acknowledge that the claimant "*must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts") (emphasis in original). Unlike with work activities, a claimant often can perform household activities under a more flexible standard and then these activities are typically judged by a lower standard of performance. *See Bjornson*, 671 F.3d at 647 (the "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."); *Hamilton*, 525 Fed. Appx. at 438 ("We have admonished ALJs to appreciate that, unlike full-time work, the 'activities of daily living' can be flexibly scheduled").

Plaintiff emphasizes the issue of a lower standard of performance, arguing in particular that she was a hoarder, and that she and her family lived in a house cluttered with dishes, unopened boxes stacked on top of each other, toys, and other objects overflowing the house, on floors and all over countertops. R. 65-66. Plaintiff stated that she tried to keep a walking area but that there was still stuff all over. She was asked by the therapist to sign a document because the therapist was concerned about food that plaintiff's son would sometimes eat "after it's been sitting out for a long time." R. 65.[3] Relying on this evidence, plaintiff argues that the ALJ "seriously overlooked" the limiting nature of her ability to clean and keep her house in order. In the ALJ's summary of plaintiff's testimony, the ALJ noted that plaintiff compared herself to a

---

[3] After the ALJ issued her decision, plaintiff's counsel submitted to the Appeals Council pictures taken of the inside of her home on May 16, 2013. Plaintiff attached these pictures to her opening brief, *see* Dkt. #11-1, and argues that they should be considered now. The government has opposed this evidence claiming it is not new or material and that plaintiff has not shown good cause for failing to produce it earlier. Dkt. # 16 at 6. This Court agrees with these arguments and has not considered this evidence.

hoarder, but the ALJ selectively ignored this evidence and failed to acknowledge the *extent* of these problems. Instead, the ALJ simply concluded that plaintiff was capable of performing a "full" and "broad' range of daily activities, which included cleaning as one of those activities. By failing to analyze this contrary evidence, the ALJ did not include a full picture of plaintiff's activities. *See Scrogham*, 765 F.3d at 699 (remanding: "the ALJ considered evidence about [claimant's daily] activities selectively, ignoring evidence that contradicted her findings"); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (an ALJ should examine these activities "with care" because "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time").

## II. Credibility Determination.

Plaintiff's second argument is that the ALJ's credibility finding was flawed. This argument has a connection to the first because it may be that the ALJ evaluated the other evidence, such as plaintiff's daily activities, by relying on an *implicit* finding that plaintiff lacked credibility. However, because the ALJ did not *explicitly* make such a connection, this Court cannot know with any certainty.

There is no dispute that plaintiff was diagnosed with major depressive disorder and generalized anxiety disorder. Both the ALJ and the medical expert agreed that these impairments *in theory* could cause the alleged symptoms and limitations. The ALJ found that these impairments were severe at step two. But the ALJ ultimately did not believe plaintiff's testimony about the "intensity, persistence and limiting effects of these symptoms." R. 32.

An ALJ's credibility determination should be reversed only if it is "patently wrong." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). At the same time, however, the Seventh Circuit has stated that a credibility determination may be reversed if the ALJ "fail[s] to

adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning.").

The Court finds that the ALJ's explanation for discounting plaintiff's testimony does not meet the above standard. The ALJ's analysis of plaintiff's credibility was set forth in this paragraph:

> To the extent that [plaintiff] asserts greater restrictions, these are not credible due to inconsistencies with other substantial evidence of record. For example, while she reported to the consultative examiner that she was terminated due to absences due to emotional stressors/problems (15F/4), she reported during her recent neuropsychological examination that she felt she was functioning fairly well as a teacher. However, she was discharged due to inability to meet increased demands imposed by downsizing. The latter statement is consistent with the ability to perform at least work in a setting with reduced cognitive and social demands.

R. 37. This paragraph contains only one specific argument. The ALJ seemed to believed that plaintiff was giving conflicting reasons for why she stopped working, telling the consultative examiner (Dr. Elmudesi) that the cause was "emotional stressors," while telling Dr. Stoll that downsizing was the cause.[4] Although the ALJ did not articulate her reasoning, she appears to have concluded that if plaintiff gave inconsistent answers to why she quit working, then she must have been lying. And if she were lying on that issue, then it is reasonable to suppose she lied about or exaggerated her depression-related problems.[5]

---

[4] The ALJ did not identify Dr. Stoll by name, but the reference to the "recent neuropsychological examination" can only be referring to her.

[5] An alternative interpretation is that the ALJ did not find that plaintiff was intentionally lying, but merely found that her ability to work as a teacher *before* downsizing is one piece of evidence that she could work a simpler, more routine job. To the extent that this is the ALJ's finding—and it is not clear whether it is—then this is not really a credibility finding. Moreover, the ALJ did not acknowledge that plaintiff's problems on the job, such as her tardies and medical leaves, pre-dated the downsizing.

- 13 -

After viewing the underlying source documents in the administrative record, the Court finds that the ALJ's description of what plaintiff told Dr. Stoll ignores or downplays several important facts that, when fully considered, raise doubts about whether this is any contradiction at all. At a minimum, the ALJ should have acknowledged and considered these facts in the analysis. This can be best shown by quoting the larger summary on which the ALJ relied. It is in the "History of Present Illness" section in the report dated February 29, 2012 and states as follows:

> She has experienced significant difficulties physically as well as with regards to mental function, particularly since 2006. She reported that she was just beginning her 12th year as a teacher at the Wisconsin School for the Deaf. She did report that she noticed in the prior 2 years of working there, she was beginning to have greater difficulties coping with situations at work. In October of 2006, she did become very ill with pneumonia and was hospitalized for 5 days. Apparently while she was hospitalized, she was also informed by one of the physicians caring for her that she could have died. She stated, "I was like oh my God. What would my kids do if I died? One of them is special needs. What would happen?" As she was recalling this, she did become quite tearful. She stated she was under significant job stress at that time. Expectations were exceeding her ability and work was increasing. She stated that numerous jobs were being cut; however, instead of having other jobs created, the remaining employees had to take on extra tasks. She stated that she did have a supervisor "telling me everyone else can do it, why can't you?" She stated that she had [] documentation at work indicating that she does have a long-standing history of problems with depression as well as anxiety including panic attacks. She stated, "I thought I was doing darn well considering I have this. Cut me some slack but they wouldn't then." She stated, "Then I became the bad teacher according to administration and a handful of coworkers who had it out for me. I don't think I was that bad of a teacher. I was there for 12 years."

R. 935-36. The ALJ's summary of this passage makes it appear that downsizing was the *only* reason plaintiff's job was terminated. However, as the above summary shows, plaintiff describes a much more complex picture in which her "long-standing" problems with depression, along with a bout of pneumonia in 2006, both then combined with the increased job demands to make her unable to continue working. In her decision, the ALJ indicated that plaintiff reported to Dr.

Stoll that she was "functioning fairly well." But the full summary shows that plaintiff stated that she was performing well "considering [that] I have this," with the "this" being her ongoing problems with depression and anxiety. She also stated that she did not think she was "*that* bad" of a teacher. These statements show that plaintiff's characterization of the termination was not solely caused by downsizing. Consequently, the ALJ's syllogistic premise was erroneous.

The critical question is whether plaintiff's statements to Dr. Stoll, when viewed accurately and reasonably in the full context of the report, are inconsistent with her statement to Dr. Elmudesi. In his report, Dr. Elmudesi included only the following sentence on this subject: "She was terminated in 2007 because of absences due to her emotional stressors/problems." R. 589. This statement is not obviously inconsistent with the statements given to Dr. Stoll. Plaintiff told both doctors that emotional problems played a role in the termination. Although Dr. Elmudesi's description does not specifically refer to downsizing, it does refer to "stressors," a vague word that could be referring to downsizing. It is thus far from clear that these two descriptions are even inconsistent, much less so inconsistent to draw an inference that plaintiff was lying. *See Hamilton*, 525 Fed. Appx. at 437 ("Testimonial inconsistencies can indeed form the basis of an adverse credibility finding, *see* SSR 96-7p, but Hamilton convincingly argues that she did not contradict herself."); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence"). In light of all these uncertainties, the Court finds that this reason, the *only* specific one cited by the ALJ, is not enough to constitute an adequate explanation for the credibility finding.

\*   \*   \*

In conclusion, based on the collective force of all the above arguments, the Court finds that a remand is warranted. In reaching this conclusion, this Court emphasizes that it is not dictating a particular result on remand, but only that further analysis and explanation be provided. A fair reading of the entire record could result in a reasonable conclusion that plaintiff is not disabled. But one of the many maddening aspects of reviewing Social Security appeals is that this Court cannot engage in that type of analysis. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014) ("In the Seventh Circuit, an ALJ's decision can be supported by substantial evidence—or even a preponderance of the evidence, as it is here—but still will be overturned if the ALJ fails to build a 'logical bridge' from the evidence to her conclusion.") (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the decision of the ALJ is remanded for further consideration.

Date: October 5, 2015   By: _____
Iain D. Johnston
United States Magistrate Judge